UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
******************************************
                                    *
JAMES JONES No. 10,                 *
            Plaintiff               *
                                    *        C. A.  No.
v.                                  *
                                    *
CITY OF BOSTON,                     *
JENNY G. DUNNE, LMHC,               *
KEYSTEPS, INC.,                     *
BETTE BOHLKE-O'GARA,                *        JURY TRIAL DEMANDED
LICSW, and/or MARY MOE,             *
            Defendants              *
                                    *
******************************************
```

# COMPLAINT

## INTRODUCTION

1.      This action against the CITY OF BOSTON, JENNY G. DUNNE, LMHC, KEYSTEPS, INC., BETTE BOHLKE-O'GARA, LICSW, and/or MARY MOE, arises out of a series of incidents in which the plaintiff, while a student in Boston International Newcomers Academy ("BINCA"), was groomed, sexually harassed, and sexually assaulted by JENNY G. DUNNE, LMHC, a counselor at BINCA, hired and supervised by BOSTON, KEYSTEPS, INC., BETTE BOHLKE-O'GARA, LICSW, and/or MARY MOE, who knew, or should have known, that DUNNE was engaged in an improper and illegal sexual relationship with a non-English speaking immigrant from El Salvador, but took no action to protect him, pursuant to their obligations under Title IX, 20 U.S.C. § 1681, Mass. G.L. c. 151C, § 2 (g), G.L. c. 93A, and further, failed to file any mandated reports, pursuant to G.L. c. 119, § 51A.

**PARTIES**

2.    Plaintiff is an individual who resides in Suffolk County and brings this action in the name JAMES JONES No. 10 ("JAMES").   He is identified in a separate Affidavit which will be served upon the defendants.

3.    Defendant CITY OF BOSTON ("BOSTON") is a municipal corporation duly organized under the laws of the Commonwealth of Massachusetts, located in Suffolk County, Massachusetts.

4.    Defendant JENNY G. DUNNE, LMHC ("DUNNE") is an individual residing at 9 Allston Street, Unit 2, in the Charlestown section of Boston, Suffolk County, Massachusetts.

5.    Defendant KEYSTEPS, INC., ("KEYSTEPS") is a corporation duly organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at 206 Minot Street, Unit 304, Boston, Suffolk County, Massachusetts.

6.    BETTE BOHLKE-O'GARA, LICSW, ("BOHLKE-O'GARA") is an individual with an ususal place of business at 206 Minot Street, Unit 304, Boston, Suffolk County, Massachusetts.

7.    MARY MOE ("MOE") is an individual with an ususal place of business at 206 Minot Street, Unit 304, Boston, Suffolk County, Massachusetts, whose true name is presently unknown to plaintiff.

**JURISDICTION AND VENUE**

8.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, as this civil action arises under the laws of the United States of America.

9.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(2), because the

events giving rise to this claim occurred within this District.

### FACTS COMMON TO ALL CLAIMS

10.    Defendant BOSTON is a public entity which, through its Public School System, maintains educational institutions which receive federal funds and assistance.

11.    At all relevant times, defendant BOSTON, through its Public School System, owned, operated, maintained, managed, supervised, and controlled, by and through its agents, servants, and employees, that institution commonly known as Boston International Newcomers Academy ("BINCA").

12.    BINCA is a High School, located at 100 Maxwell St, Boston, and is a school within the BOSTON Public School System.

13.    At all times relevant to this action, defendant BOSTON employed all school staff, faculty, counselors, and principals at BINCA.

14.    At all times relevant to this action defendant BOSTON, through its School Department, was responsible for the operations and administration of BINCA, and supervised defendant DUNNE.

15.    At all times relevant to this claim, defendant DUNNE was utilized by defendant BOSTON as a Counselor at BINCA, and at all times during the time she worked at BINCA, was defendant BOSTON'S agent..

16.    At all times relevant to this claim, defendant DUNNE was a Counselor at BINCA under the supervision and control of defendant BOSTON.

17.    At all relevant times and in all actions described in this Complaint, defendant BOSTON's employees and personnel at BINCA, including, without limitation, defendant DUNNE, were acting under the color of law, under color of their authority

as members of the BOSTON School District, and within the scope of their duties assigned to them by defendant BOSTON.

18. At all times relevant to this action, plaintiff JAMES was a student in BINCA.

19. At all times relevant to this claim, defendant BOSTON and its personnel at BINCA were each Mandated Reporters who had a duty, under G.L. c. 119, §51A, to report all instances of sexual abuse of students at BOSTON schools to the Massachusetts Department of Children and Families, or a law enforcement agency.

20. Plaintiff JAMES came to the United States from El Salvador in February, 2012, when he was 16 years old, on his own, because he was told he had to become a member of a criminal gang or he would be killed, if he stayed in El Salvador.

21. JAMES did not speak any English, and he started working and attending BINCA, in the 9th grade, because of his lack of language skill. See Exhibit A, Plaintiff's Affidavit in Suffolk Probate Court proceeding for finding as a Special Immigrant Juvenile, Docket No. SU16E0049QC.

22. Defendant DUNNE was a School Counselor at BINCA during the time JAMES was a student there. See Exhibit B, Affidavit of Jenny Dunne, Docket No. SU16E0049QC.

23. Defendant DUNNE began grooming JAMES when he started the 9th grade, singling him out for special attention, praise and constant compliments.

24. Over the next two years, defendant DUNNE and JAMES spent much of their time at BINCA together. JAMES would go to DUNNE's office and spend hours there. If as a result he would be late for, or miss, a class, DUNNE would write a pass for him.

4

25.  Defendant DUNNE started taking JAMES in her car to different places after school. They would eat out together, talk by phone and text each other.

26.  If defendant DUNNE saw JAMES talking to girls, she would become jealous and ask if they were JAMES' girlfriends.

27.  In the 10th grade, defendant DUNNE would hold JAMES' hand while they were driving.  They would often leave school together, in her car.

28.  During that time, defendant DUNNE took JAMES to a movie at the Assembly Theater, on what JAMES understood to be a date.  While in the theater, they started touching each other sexually.  When they went out to the car, they continued and had full sexual intercourse in the car.  They left the parking lot and went to DUNNE's home in Charlestown, where they continued with more sexual contacts. After that, JAMES and defendant DUNNE would go to her home and have sexual relations three times a week, for at least two years.

29.  In school, defendant DUNNE and JAMES would spend more time in her office.  One time DUNNE's skirt zipper broke.  She locked the door and they had sex in the office that day.  There were at least two times when they had sexual relations in DUNNE's office at BINCA.

30.  Defendant DUNNE would ask JAMES to help with her nails. She would send him provocative pictures and ask how she looked.  This was the first time anyone had ever treated JAMES this way.  He had very deep feelings for DUNNE and thought she felt the same towards him.

31.  One day defendant DUNNE told JAMES she had missed her period and thought she might be pregnant with his child. JAMES was happy and excited at the

prospect, but DUNNE was upset, which depressed him.

32.   Defendant DUNNE created the idea that she and JAMES could have a life together. JAMES would stay overnight at her home, and he brought clothes so he could change when he went to school the next day.  DUNNE would go to his school soccer games and cheer him on.  Afterwards, she would take him to school in her car, instead of him going in the school bus.  Dunne would plan his life, telling him where he would go to college, what kind of career he would have, and discuss moving to a different state where no one would know them and they could start a new life.

33.   The relationship between defendant DUNNE and JAMES continued throughout his time at BINCA, and afterwards.  DUNNE would alternate between wanting JAMES in her life and rejecting him.  Through this entire time, JAMES was in love with DUNNE and he thought she felt the same emotions towards him.

34.   The last time JAMES saw defendant DUNNE was July, 2021, when he was playing in a soccer game.  DUNNE came over to him after the game and invited him to have a coffee.  She brought him back to her home, told him to take a shower because he was sweaty, and then spent that the rest of that day and night having sex with JAMES.

35.   The following day, defendant DUNNE texted JAMES, saying he was different and the relationship was over.  JAMES was hurt by this rejection to the point of feeling he didn't want to live without her.

36.   While defendant DUNNE was at BINCA, she was a Master's Level Counselor.

37.   As part of her education and training, defendant DUNNE was aware of the

6

requirement to maintain professional boundaries with the people for whom she was providing counseling.

38.    Defendant DUNNE's education also included training relating to the concepts of transference and counter-transference.

39.    She was taught to be aware of these phenomena, how they could harm a person being counseled, what precautions she was required to take so it should not happen, and what to do if it did.

40.    In November, 2017, defendant DUNNE became a Massachusetts Licensed Mental Health Counselor.

41.    Regulation 262CMR 2.05 (2)(a)10 of the Massachusetts Board of Allied Mental Health and Human Services Professions state a Licensed Mental Health Counselor must have the following qualification:

> Knowledge and understanding of the standards set by the code of ethics of the American Counseling Association and the American Mental Health Counselors Association.

42.    The American Counseling Association, the professional organization for counselors, in 2014, published a Code of Ethics which contained the following provision:

> A.5.a. Sexual and/or Romantic Relationships Prohibited. Sexual and/or romantic counselor-client interactions or relationships with current clients, their romantic partners, or their family members are prohibited.

43.    The American Mental Health Counselors Association, in 2015, published a Code of Ethics which contained the following provision:

> 4. Exploitive Relationships
> CMHCs are aware of the intimacy and responsibilities inherent in the counseling relationship. They maintain respect for the client and avoid actions that seek to meet their personal needs

7

at the expense of the client.  a.  Romantic or sexual relationships with clients . . . are strictly prohibited.

44.   Defendant DUNNE was aware at all times during her relationship with JAMES that it was improper and illegal, but continued nonetheless with a sexual relationship which was harmful to him.

45.   It was not until sometime after July, 2021, that JAMES began to understand that this was not a normal romantic relationship, but that defendant DUNNE had taken advantage of him and did not feel the same emotions which he did.

46.   In 2023, JAMES went back to BINCA, and sought out Toni Jackson, a teacher who knew both him and defendant DUNNE while he attended the school.  James told Toni Jackson about his relationship with DUNNE.  Toni Jackson told JAMES that he should not tell anyone about the relationship.

47.   Toni Jackson did not file a 51A report.  Toni Jackson did not report to any superior what JAMES told her about DUNNE. Toni Jackson did not offer JAMES any resources to deal with his concerns or harm.

48.   Defendant KEYSTEPS has "thirty-five (35) years of experience working in the City of Boston."  Its "Licensed Masters' level KeyStep counselors offer full time, year round school-based counseling to help newcomers to the country . . . cope with and resolve issues that hamper their ability to fully participate in academic work. . . .They learn to anticipate and avoid risky behaviors, and make responsible choices that lead to healthy futures."

49.   At all relevant times, defendant BOHLKE-O'GARA was the Executive Director of defendant KEYSTEPS.

50. Defendant BOHLKE-O'GARA is a Licensed Independent Clinical Social Worker, well-trained in the concepts of boundaries, transference and counter-transference.

51. Defendant BOHLKE-O'GARA was one of the founders of defendant KEYSTEPS.

52. One of the stated purposes of defendant KEYSTEPS is to protect vulnerable students from the consequences of "risky" sexual conduct.

53. Defendant BOHLKE-O'GARA was responsible for the hiring, training, supervision, and retention of defendant KEYSTEPS' employees, particularly its Masters' level KEYSTEPS' Counselors.

54. Alternatively, MARY MOE, a KEYSTEPS employee under the supervision of defendant BOHLKE-O'GARA, was responsible for the hiring, training, supervision, and retention of defendant KEYSTEPS' employees, particularly its Masters' level KEYSTEPS Counselors.

55. At all relevant times, defendants BOHLKE-O'GARA and/or MOE were responsible for the hiring, training, supervision, and retention of defendant DUNNE.

56. The relationship of defendant DUNNE with JAMES occurred at BINCA over a long period of time, and was readily observable.

57. No BOSTON employees, who were mandated reporters, made any report of this information to the Department of Children and Families or the Boston Police Department, despite the requirement to do so under G.L. c. 119, § 51A.

58. No KEYSTEPS employees, who were mandated reporters, made any report of this information to the Department of Children and Families or the Boston Police Department, despite the requirement to do so under G.L. c. 119, § 51A.

59. By these failures to perform this duty, defendant BOSTON negligently inflicted

emotional distress upon JAMES, because defendant DUNNE was able to continue her conduct for several years.

60.   By these failures to perform this duty, defendant KEYSTEPS negligently inflicted emotional distress upon JAMES, because defendant DUNNE was able to continue her conduct for several years.

61.   Because of these several failures of defendants BOSTON, KEYSTEPS, BOHLKE-O'GARA, and/or MOE, JAMES was reasonably unable to understand that as a result of defendant DUNNE's sexual abuse and assaults, he had been severely harmed by defendant DUNNE.

## CLAIM 1 - NEGLIGENCE

62.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

63.   At all relevant times defendant DUNNE was defendant BOSTON's agent for the purpose of counseling vulnerable children at BINCA.

64.   Defendant BOSTON created the conditions under which defendant DUNNE was able to groom, sexually assault, and/or sexually harass JAMES, and without which she would not have been able to do so.

65.   Defendant BOSTON knew or should have known that defendant DUNNE would sexually assault, and/or sexually harass JAMES, and failed to prevent it, or to protect him from future assaults, after becoming aware of defendant DUNNE's conduct.

66.   Further, defendant BOSTON failed to perform its statutory duties under G.L. c. 119, §51A.

67.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant BOSTON's negligence.

## CLAIM 2 - NEGLIGENT SUPERVISION AND RETENTION

68.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

69.   At all relevant times defendant DUNNE was defendant BOSTON's agent for the purpose of counseling vulnerable children at BINCA.

70.   Defendant BOSTON had a duty to exercise reasonable care in the training, supervision, and retention of defendant DUNNE.  It was negligent and breached this duty.

71.   As a result of defendant's BOSTON's negligence and breach of duty in the training, supervision, and retention of defendant DUNNE, it allowed defendant DUNNE to sexually assault and sexually harass JAMES, and continue to sexually assault him after becoming aware of defendant DUNNE's  conduct.

72.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant BOSTON's negligence.

## CLAIM 3 - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

73.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

74.   At all relevant times defendant DUNNE was defendant BOSTON's agent for the purpose of counseling vulnerable children at BINCA.

75. By its conduct, defendant BOSTON negligently inflicted emotional distress on JAMES, by the negligent training, supervision, and retention of defendant DUNNE, and/or by allowing defendant DUNNE to sexually assault, and/or sexually harass JAMES, and continue to sexually assault JAMES after becoming aware of defendant DUNNE's conduct, and knew or should have known that its negligence would result in emotional distress to JAMES.

76. JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, physical symptoms, as well as other consequential damages as a result of defendant BOSTON's negligence.

## CLAIM 4 - VIOLATIONS OF G.L. C. 151C

77. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

78. At all relevant times defendant DUNNE was defendant BOSTON's agent for the purpose of counseling vulnerable children at BINCA.

79. Defendant BOSTON is an educational institution within the meaning of G.L. c. 151C, § 2 (g).

80. Defendant BOSTON is strictly and vicariously liable for actions committed by the persons under its supervision and control who have assigned duties in its schools.

81. Defendant BOSTON committed an unfair educational practice under G.L. c. 151C, § 2 (g) when defendant DUNNE, a person under the supervision and control of defendant BOSTON, sexually assaulted, battered and harassed JAMES, a student at BINCA.

82. Defendant BOSTON committed an unfair educational practice under G.L. c. 151C,

§ 2 (g) when it became aware defendant DUNNE, a person under the supervision and control of defendant BOSTON, had sexually assaulted, battered and harassed JAMES, a student at BINCA, but took no action to stop DUNNE from future sexual assaults, batteries and harassment, after becoming aware of defendant DUNNE's conduct.

83. The sexual assaults, batteries and harassment, perpetrated by defendant DUNNE, under the supervision of defendant BOSTON, had the purpose or effect of interfering with JAMES's education by creating an intimidating, hostile, humiliating, and sexually offensive educational environment.

84. As a result of defendant BOSTON's unfair educational practices, in violation of G.L. c. 151C, § 2 (g), and enforceable through G.L. c. 214, § 1C, JAMES suffered and continues to suffer severe and permanent mental distress, emotional harm, as well as other consequential damages.

## CLAIM 5 - VIOLATIONS OF 20 U.S.C.A. §1681(c), TITLE IX

85. Defendant BOSTON is an educational institution as defined by 20 U.S.C.A. §1681(c), Title IX, Education Amendments of 1972 (hereinafter "Title IX") which receives federal financial assistance, through a variety of educational programs.  As a result, even if it were not obliged to do so under state law, BOSTON was required to adopt and implement sexual harassment policies under Title IX.

86. At all relevant times defendant DUNNE was defendant BOSTON's agent for the purpose of counseling vulnerable children at BINCA.

87. Plaintiff JAMES suffered extraordinary harm due to the repeated sexually harassing conduct of defendant DUNNE, and the sexually hostile environment created by her,

of which defendant BOSTON had actual knowledge and failed to correct.

88. Defendant BOSTON failed to take appropriate actions to protect plaintiff from sexual harassment within its school system, after having actual notice of the harassment, all in violation of Title IX and in violation of rights guaranteed by the United States and Massachusetts constitutions, statutes, laws and regulations.

89. Defendant BOSTON actually knew about the specific misconduct and sexual harassment committed by defendant DUNNE, and was deliberately indifferent to this conduct, all to plaintiff's harm and continuing exposure to a sexually hostile educational environment.

90. Alternatively, BOSTON should have been aware of defendant DUNNE's misconduct, and the sexual harassment of the plaintiff committed by DUNNE, due to its pervasive nature, and DUNNE's open and obvious inappropriate acts, including engaging in sexual conduct in her office in the BINCA school building.

91. Defendant BOSTON, through its actions and inactions described herein, and through a pattern of deliberate indifference, created and permitted a severe, pervasive and persistent sexually hostile educational environment in violation of Title IX of the Education Amendments of 1972.

92. DUNNE's sexually harassing conduct and physical touching were not welcomed by plaintiff, and were not made with the plaintiff's permission.

93. Defendant BOSTON violated the requirements of Title IX by these acts and omissions, all of which were conducted, and/or failed to be conducted, in reckless and deliberate indifference to the rights of plaintiff guaranteed by Title IX and in reckless and deliberate indifference to the risk of harm posed to plaintiff.

94.     As a result of defendant BOSTON's violation of Title IX, plaintiff JAMES has suffered significant financial losses, including but not limited to loss of educational and employment opportunities, resultant loss of income, and medical expenses.

## CLAIM 6 - NEGLIGENCE

95.     Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

96.     Defendant DUNNE negligently injured plaintiff JAMES by grooming him, while she was acting as his school counselor, in order to engage him in unlawful sexual conduct, and then engaging in sexual conduct with him, when she knew, or should have known, he was incapable of voluntarily consenting to sexual relations with her, because of the difference in their status, and the power of her position.

97.     JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant DUNNE's negligent conduct.

## CLAIM 7 - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

98.     Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

99.     Defendant DUNNE negligently inflicted emotional distress upon plaintiff JAMES by placing him in fear that she would engage, or would attempt to engage, in unlawful and non-consensual sexual conduct with him in the future.

100.    JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant DUNNE's negligent conduct.

## CLAIM 8 - BATTERY

101.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint

102.   Defendant DUNNE battered the plaintiff JAMES, by engaging in unlawful and non-consensual sexual conduct with him.

103.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant DUNNE's intentional conduct.

## CLAIM 9 - ASSAULT

104.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

105.   Defendant DUNNE assaulted the plaintiff JAMES, by placing him in fear that she would engage, or would attempt to engage, in unlawful and non-consensual sexual conduct with him.

106.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant DUNNE's intentional conduct.

## CLAIM 10 - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

107.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

108.   Defendant DUNNE intentionally inflicted emotional distress upon plaintiff JAMES by placing him in fear that she would engage, or would attempt to engage, in unlawful and non-consensual sexual conduct with him in the future.

109. JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant DUNNE's intentional conduct.

### CLAIM 11 - CIVIL RIGHTS

110. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

111. Defendant DUNNE interfered with plaintiff JAMES's rights under the constitution and laws of the United States, and under the constitution and laws of the Commonwealth of Massachusetts by threats, intimidation and coercion.

112. Defendant DUNNE's conduct deprived plaintiff JAMES of his constitutional rights to bodily integrity, and to be free from sexual harassment which constitutes discrimination, based upon his gender, under both Article 1 of the Declaration of Rights, and the Equal Protection clause of the Fourteenth Amendment to the United States Constitution. Defendant DUNNE is liable to the plaintiff in accordance with G.L. c. 12, §§11H & 11I.

113. Plaintiff JAMES suffered bodily harm, humiliation, severe emotional distress, and permanent psychological damages. He has incurred expenses and will likely incur future expenses for medical and psychological treatment, and has suffered loss of earning capacity.

### CLAIM 12 - NEGLIGENCE

114. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

115. Defendant KEYSTEPS knew or should have known that defendant DUNNE would

17

sexually assault, and/or sexually harass JAMES, and failed to prevent it, or to protect him from future assaults, after becoming aware of defendant DUNNE's conduct.

116.   Further, defendant KEYSTEPS failed to perform its statutory duties under G.L. c. 119, §51A.

117.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant KEYSTEPS' negligence.

## CLAIM 13 - NEGLIGENT HIRING, SUPERVISION AND RETENTION

118.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

119.   Defendant KEYSTEPS had a duty to exercise reasonable care in the hiring, training, supervision, and retention of defendant DUNNE.  It was negligent and breached this duty.

120.   As a result of defendant KEYSTEPS' negligence and breach of duty in the hiring, training, supervision, and retention of defendant DUNNE, it allowed and failed to prevent defendant DUNNE from sexually assaulting and sexually harassing JAMES, and continuing to sexually assault him after becoming aware of defendant DUNNE's conduct.

121.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendant BOSTON's negligence.

**CLAIM 14 - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

122.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

123.   By its conduct, defendant KEYSTEPS negligently inflicted emotional distress on JAMES, by the negligent hiring, training, supervision, and retention of defendant DUNNE, and/or by allowing and/or failing to prevent defendant DUNNE from sexually assaulting, and/or sexually harassing JAMES, and continuing to assault JAMES after becoming aware of defendant DUNNE's conduct, and knew or should have known that its negligence would result in emotional distress to JAMES.

124.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, physical symptoms, as well as other consequential damages as a result of defendant BOSTON's negligence.

**CLAIM 15 - NEGLIGENCE**

125.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

126.   Defendants BOHLKE-O'GARA and/or MOE knew or should have known that defendant DUNNE would sexually assault, and/or sexually harass JAMES, and failed to prevent it, or to protect him from future assaults, after becoming aware of defendant DUNNE's conduct.

127.   Further, defendants BOHLKE-O'GARA and/or MOE failed to perform their statutory duties under G.L. c. 119, §51A.

128.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of

19

defendants BOHLKE-O'GARA and/or MOE's negligence.

## CLAIM 16 - NEGLIGENT HIRING, SUPERVISION AND RETENTION

129.  Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

130.  Defendants BOHLKE-O'GARA and/or MOE had a duty to exercise reasonable care in the hiring, training, supervision, and retention of defendant DUNNE.  They were negligent and breached this duty.

131.  As a result of defendants BOHLKE-O'GARA and/or MOE 's negligence and breach of duty in the hiring, training, supervision, and retention of defendant DUNNE, they allowed and failed to prevent defendant DUNNE from sexually assaulting and sexually harassing JAMES, and continuing to sexually assault him after becoming aware of defendant DUNNE's conduct.

132.  JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, as well as other consequential damages as a result of defendants BOHLKE-O'GARA and/or MOE's negligence.

## CLAIM 17 - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

133.  Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

134.  By their conduct, defendants BOHLKE-O'GARA and/or MOE negligently inflicted emotional distress on JAMES, by the negligent hiring, training, supervision, and retention of defendant DUNNE, and/or by allowing and/or failing to prevent defendant DUNNE from sexually assaulting, and/or sexually harassing JAMES, and continuing to assault JAMES after becoming aware of defendant DUNNE's

conduct, and knew or should have known that their negligence would result in emotional distress to JAMES.

135.   JAMES has suffered and continues to suffer severe and permanent mental distress and emotional harm, physical symptoms, as well as other consequential damages as a result of defendants BOHLKE-O'GARA and/or MOE's negligence.

## CLAIM 18 - VIOLATIONS OF G.L. c. 93A

136.   Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

137.   On March 18, 2024, the plaintiff JAMES sent to defendant DUNNE a written demand for relief, in accordance with G.L. c. 93A, §9. A copy of said demand letter, redacted only with reference to information identifying the plaintiff, is annexed hereto, marked "Exhibit C," and fully incorporated herein.

138.   Defendant DUNNE engaged in unfair and deceptive acts or practices under G.L. c. 93A, §2, in violation of 940 CMR 3.00.

139.   Jones was a non-English speaking, 16 year old immigrant, from El Salvador, when he came to Boston in 2012 and enrolled in BINCA.  He consulted defendant DUNNE in her capacity as a Masters' Level KeySteps Counselor at BINCA. Beginning in 2013, defendant DUNNE used her position to groom JAMES, and then to engage in a sexual relationship with him, which continued until July, 2021.

140.   The American Counseling Association, in 2014, published a Code of Ethics which contained the following provision: "A.5.a. Sexual and/or Romantic Relationships Prohibited.  Sexual and/or romantic counselor-client interactions or relationships with current clients, their romantic partners, or their family members are prohibited."

141.  In November, 2017, Ms. Dunne became a Massachusetts Licensed Mental Health Counselor.

142.  The American Mental Health Counselors Association, in 2015, published a Code of Ethics which contained the following provision:   "4. Exploitive Relationships. CMHCs are aware of the intimacy and responsibilities inherent in the counseling relationship. They maintain respect for the client and avoid actions that seek to meet their personal needs at the expense of the client.  a.  Romantic or sexual relationships with clients . . . are strictly prohibited."

143.  The Massachusetts Board of Allied Mental Health and Human Services Professions Regulations, in Regulation 262 CMR 2.05 (2)(a)10, states a Licensed Mental Health Counselor must have the following qualification in order to become a Licensed Mental Health Counselor: "Knowledge and understanding of the standards set by the code of ethics of the American Counseling Association and the American Mental Health Counselors Association."

144.  The Regulations of the Massachusetts Attorney General, adopted to implement Mass. G.L. c. 93A, state:  940 CMR 3.16 (3): "Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of Mass. G.L. c. 93A, § 2 if: . . .(3)  It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection."

145.  Defendant DUNNE's sexual involvement with the plaintiff JAMES, while he was a student at BINCA and she was his counselor, is a clear violation of the American

Counseling Association standards.

146.  Defendant DUNNE's continued sexual involvement with the plaintiff JAMES, after she became a state licensed Mental Health counselor is an additional clear violation of the Board of Allied Mental Health and Human Services Professions regulations.

147.  Both of these violations are of regulations "meant for the protection of the public's health, safety or welfare," and thus are also violations of G.L. c. 93A.

148.  Defendant DUNNE responded to JAMES' demand letter on April 17, 2024. A copy her response is attached, marked "Exhibit D."

149.  Defendant DUNNE's response was not a reasonable written tender of settlement in view of the damages sustained by the plaintiff.

150.  Defendant DUNNE's use or employment of the unfair and deceptive acts or practices alleged above constituted willful or knowing violations of G.L. c. 93A, §2, and the Regulations of the Attorney General promulgated thereunder.

151.  Defendant DUNNE's' refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the acts or practices complained of violate G.L. c. 93A, §2, and the Regulations promulgated thereunder.

152.  As a direct and proximate result of Defendant DUNNE's violation of G.L. c. 93A, the plaintiff JAMES has suffered serious personal injuries.

### CLAIM 19 - VIOLATIONS OF G.L. c. 93A

153.  Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

154.  On March 18, 2024, the plaintiff JAMES sent to defendant KEYSTEPS a written demand for relief, in accordance with G.L. c. 93A, §9. A copy of said demand letter,

redacted only with reference to information identifying the plaintiff, is annexed hereto, marked "Exhibit C," and fully incorporated herein.

155. Defendant KEYSTEPS received the demand letter on March 25, 2024.

156. Defendant KEYSTEPS engaged in unfair and deceptive acts or practices under G.L. c. 93A, §2, in violation of 940 CMR 3.00 & 6.00

157. Prior to JAMES's decision to attend BINCA, defendant KEYSTEPS made false and/or misleading representations to him, and the general public, in advertising, promotional materials and internet postings.

158. Defendant KEYSTEPS constantly asserted it had "thirty-five (35) years of experience working in the City of Boston."  It  consistently represented to the public that its "Licensed Masters' level KeyStep counselors offer full time, year round school-based counseling to help newcomers to the country . . . cope with and resolve issues that hamper their ability to fully participate in academic work. . . .They learn to anticipate and avoid risky behaviors, and make responsible choices that lead to healthy futures."

159. Defendant KEYSTEPS placed DUNNE at BINCA, where she counseled  JAMES, starting when he was 17 years old, spoke no English, and lacked an adult's understanding of social and sexual relationships. Defendant KEYSTEPS made public representations that its stated purpose was to protect vulnerable students from the consequences of "risky" sexual conduct.  It failed to disclose it was not training its counselors to avoid sexual relationships with the students it was tasked to protect.

160. Defendant KEYSTEPS' conduct violated Massachusetts Attorney General's

Regulations 940 CMR  3.05(1) & 6.04(1):

3.05:  General Misrepresentations. (1) No claim or representation shall be made by any means concerning a product which directly, or by implication, . . . has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect.

6.04:  General Requirements.  (1) Misleading Representations.  It is an unfair or deceptive act for a seller to make any material representation of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading, or if the seller does not have sufficient information upon which a reasonable belief in the truth of the material representation could be based.

161. Defendant KEYSTEPS' use or employment of the unfair and deceptive acts or practices alleged above constituted willful or knowing violations of G.L. c. 93A, §2, and the Regulations of the Attorney General promulgated thereunder.

162. As a direct and proximate result of the defendant KEYSTEPS' violation of G.L. c. 93A, the plaintiff has suffered serious personal injuries.

## DEMANDS FOR RELIEF

Plaintiff requests the Court to grant the Plaintiff the following relief:

A. Judgment against defendant BOSTON on each of the Claims stated, in an amount which is fair, just and adequate for the injuries and damages sustained, and the pain and suffering endured, plus interest, costs, and attorney's fees in accordance with G.L. c. 151B, s. 9.

B.     Judgment against defendant DUNNE on each of the Claims stated, in an amount which is fair, just and adequate for the injuries and damages sustained, and the pain and suffering endured, plus interest, costs and attorney's fees.

C.     Judgment against defendant KEYSTEPS on each of the Claims stated, in an amount which is fair, just and adequate for the injuries and damages sustained, and the pain and suffering endured, plus interest, costs and attorney's fees.

D.     Judgment against defendants BOHLKE-O'GARA and/or MOE on each of the Claims stated, in an amount which is fair, just and adequate for the injuries and damages sustained, and the pain and suffering endured, plus interest, costs and attorney's fees.

E.     Judgment against defendants DUNNE and KEYSTEPS on the Claims under G.L. c. 93A , including enhanced damages and attorneys fee.

F.     Such other and further relief as the Court may deem appropriate and just.

**DEMAND FOR JURY TRIAL**

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS**.

By his Attorneys,

/s/ *Carmen L. Durso*
CARMEN L. DURSO, ESQUIRE
BBO # 139340
Law Office of Carmen L. Durso
276 Union Avenue
Framingham, MA 01702
617-728-9123  / *carmen@dursolaw.com*

*/s/ Michael J. Heineman*
MICHAEL J. HEINEMAN, ESQUIRE
BBO # 556841
Heinlein Beeler Mingace & Heineman, PC
276 Union Avenue
Framingham, MA 01702
(508) 626-8500
MHeineman@HBMHlaw.com

June 28, 2024

EXHIBIT "A"

16E0049

## Declaration of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

I, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, being duly sworn, affirm, under the pains and penalties of perjury, that the following is true and correct to the best of my knowledge and belief. This affidavit is drafted by my attorney based on oral communications to her in Spanish and English.

### Overview

1. My name is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. I was born in San Pedro Perulapán Cuscatlán, El Salvador on November 9, 1995. I am twenty years old. I currently reside at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, MA with my older cousin ▓▓▓▓▓▓, his stepson ▓▓▓▓▓▓▓▓, and my other older cousin ▓▓▓. I am unmarried and have no children.

2. My parents are ▓▓▓▓▓▓▓▓▓▓▓▓and▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. My parents are still married even though they have not lived together since I was a young child. My mother currently lives in El Salvador and my father lives in Quincy, MA in the U.S.

3. I was approximately six years old when my father came to the U.S. After my father left El Salvador, I lived with my mother, brother, and two sisters. My older brother came to the U.S. when I was approximately ten or eleven years old.

4. My life and the life of my family in El Salvador were very difficult. My mother could not provide basic things for me. While growing up, there was never enough money for clothes, shoes, or medication when we became sick. When I was approximately five or six years old I had to start working in order to help support my family. At approximately age ten I began working in the fields because my mother told me that I had to work if I wanted to continue living in our house. I worked until I came to the United States. Since I was forced to work in El Salvador to support my family, I never had time to study, and I would have to miss school to go to work. My mom was very sick while I was growing up. Her sickness forced her to stop working and I had to take care of her. Even though I was only a kid, I was the main provider for my family. This was a big responsibility and was very stressful for me.

5. During the time when I lived in El Salvador and my father was in the United States, we barely ever spoke. My father knew that I had to start working almost immediately after he left and he did not care. Like my mother, my father believes I needed to work instead of going to school. When I was approximately twelve or thirteen years old my father returned to El Salvador for approximately one year. My father was very serious and very little things would get him mad. He would beat me with a belt whenever he thought I would misbehave. I saw him hit my two sisters as well.

6. My neighborhood in El Salvador is a very dangerous neighborhood. I began being targeted for gang recruitment by both of the rival gangs in and around my village. I was threatened with guns and knives and lived constantly afraid I was going to be killed. Gang members murdered my close friends and I feared I was going to be next. My mother was not able to protect me from the gangs in our neighborhood, especially

FILED

MAR 23 2016   M

Suffolk Probate Court   #8

"Exhibit A"

16E0049

because she was sick. She sent me to live with my grandmother but I could not go to school there because she wanted me to work. There were gangs near my grandmother's house too and I was not safe.

7. When my family was directly threatened because I refused to help the gangs, my mother told me I could no longer live in her house. Feeling unsafe and alone, I decided to come to the United States so that I could be safe. I entered the United States in approximately February 2012. I have been living in Massachusetts since I arrived in this country. I was never apprehended by immigration officials.

8. Until recently, I had been living with my father and my older brother in Massachusetts. Life with my father and brother was very hard for me. When I arrived, even though I was only sixteen years old, my father did not help me or want me to continue school. He told me I needed to work or I had to live in the streets. I began to work to help support myself but I only made enough money just to get by. Also, my father and brother drink a lot and can become very violent when they drink.

9. Despite what I was going through at home, in September of 2013 I enrolled in school at Boston International High School. I have been going to school full time and I am very happy. I am in the 11th grade. In El Salvador I never thought it was possible to continue my education. In the U.S., I know that it is a reality. I have found a lot of support at school that has helped me feel safe and positive.

10. In March 2016 I moved to East Boston, MA to live with my older cousins ███████and ████. My cousins have been very supportive of me since I arrived in the United States and are willing to help me while I continue my education. They understand what I went through in El Salvador and with my father in the United States. With the support I am receiving from my school and my extended family, I now feel like I can prosper and overcome what I have been through if I am allowed to stay in this country.

<u>Life in El Salvador</u>

11. I grew up in San Pedro Peruplan, Cuscatlan, El Salvador with my mother and two sisters. My father and older brother already lived in the United States – I was approximately ten years old when my brother left for the United States. My mother and younger sisters remain in El Salvador.

12. My father moved to the United States when I was six years old because we were struggling financially. Food was very hard to come by; there was not enough food to eat for all of us. I often remember being hungry as a child but I never knew any different. Because we had so little to eat, I often gave my small portion of food to my younger sister, ███████.

13. With my father and brother gone, my family treated me as if I was the man of the house, which meant that I had to work from a very young age. When I was too young to go to school, I had to wake up at five in the morning to prepare food with my mother and then we would go sell it until two in the afternoon. I was approximately five or six years old when I started working selling food with my mom. When I was a little older, I would go

16E0049

to school for four hours in the morning and then go to work until six or seven in the evening. Then, when I was around ten years old I started working in the fields. I worked cultivating maize, beans, and other crops. The work was physically exhausting; my hands would hurt and I was so tired I could not even walk.

14. Even if I did not want to work because I was tired or because I wanted to go to school, I knew I had to. I knew my mother would kick me out if I did not work; I also knew I was responsible for working and making money for my family. Since my father was gone, my mother thought that I was responsible for financially supporting my family, even if I was a kid and even if I had an older sister.

15. Also, my mother's health prevented her from being able to provide for my siblings and me. She had a heart and lung condition. When I was very young she would cook food that we would sell together but, when she cooked, she couldn't breathe. I remember when I was very young my mom had a heart attack that required her to be hospitalized. I, together with my older sister � ▬▬▬▬ were responsible for taking care of my mom because she couldn't be left alone.

16. When I was about eleven or twelve years old my mom stopped working completely due to her illness and I became the sole financial provider for my mother and sisters. I liked going to school but I never had time to study because I had to work to support my family. Many times I had to miss school to go to work. This made me very sad because I always loved school very much and was a very good student. However, my mother and father never cared about how I did in school and they thought working was what was important.

17. Even though I worked extremely hard, our situation was still not better. We could never afford to buy new clothes and could buy just enough food to survive. There was no electricity in my house for most of my life or running water. Our house was made of mud and was in not in a good condition.

18. During the years that I lived separated from my father I did not feel like I had a father-figure in my life. My dad rarely called, and when he did, he would speak to my mother instead of me. I remember my mother would tell me that he was my father and that I had to remember that. I tried but since he rarely spoke to me, I often felt like he did not care about me or our family.

19. When I was in approximately twelve or thirteen years old my father returned to El Salvador for one year. Having my father around was like having a stranger in our house. He was very strict and controlling of my siblings and I. He always looked very serious and I never felt comfortable with him. When my father would get angry with me he would punish me by beating me with a belt. When he would hit me I would run away from the house and not come back until very late. It hurt me that after not seeing my father for so long, he treated me like this. My father returned to the U.S. a year after he had arrived in El Salvador.

<u>My Life was In Danger</u>

16E0049

20. In my town in El Salvador, the 18th street gang has a very strong presence. They are a very violent gang- they kill, torture, and steal from innocent people including children. MS-13, their rival gang, runs the territory around my town. I remember hearing about at least two gang- related deaths per day.

21. When I was approximately eleven years old I began receiving death threats by both MS-13 and the 18th street gang because they tried to recruit me and I refused. They threatened me with guns, knives, and other weapons. They told me that they would kill and torture me and my family if I refused to help them.

22. My school was in the middle of a battle ground by both of the gangs and I was repeatedly threatened whenever I tried to go. I started going to school farther away to try to escape the gang, but that was useless because the 18th street gang controlled the area of the other school.

23. One day, two of my close friends, ████████████, invited me to go play soccer as we did on many occasions. That day I could not go because I had to run an errand for my mother. Later that day I learned that gang members had killed ████████████. Losing my two friends was so hard for me, I felt alone and scared. I also know that if I had been with them that day, I would have been killed as well.

24. I was so scared and had no one to protect me, as there was nothing my family could do to help me.  My mother was sick and had little control of what was going on around us. I could not seek protection from the police in El Salvador because they do not help anyone in my village. There is little police presence where I live and some police officers are themselves in gangs.

25. Because I was so scared the gangs would hurt or kill me, I went to live with my grandmother for one month.  But all she wanted me to do was work, so I stopped going to school.  I really wanted to continue school but had no choice except to stop attending. I worked every day that I lived with her. I told my grandmother that I wanted to go to the United States to join my father and brother, and I went home to my mother's house to tell her goodbye. When I returned home I learned that the gang members had threatened to kill my family. My mother told me that I had to leave the house immediately and that I could no longer live with them because she and my sisters were in danger because of me.

<u>Trip to the United States</u>

26. My father arranged my trip from El Salvador to the United States.  I left El Salvador on approximately January 10, 2012 because I had nowhere where I could live safely. I did not know what the trip would be like or that it would be so dangerous. My father, despite knowing how dangerous the trip would be, did not try and stop me or warn me. I left directly from my mother's house.

27. My trip from El Salvador to the United States lasted around 22 days. We traveled from El Salvador through Guatemala and Mexico to the U.S., traveling by bus or car. We spent four days in the desert where we had no food and little water. It was very scary because

16E0049

we had to walk at night in order not be seen. On or about February 1, 2012, I arrived in United States. When we arrived in the United States, we traveled by car to Boston, MA.

<u>Life With My Father and Brother in the U.S.</u>

28. I was sixteen years old when I arrived in the United States. Upon arriving, I began to live with my father in Dorchester, MA. I had a lot of hope that, despite being away and not having a relationship for many years, my father and I would be able to become close and that I would finally have someone who would look after me.

29. However, since I arrived in the United States my father has not taken an interest in developing a relationship with me. When I first arrived, I was very anxious to enroll in school and continue my education because I have always loved school. My father immediately told me that I had to work to make a living in the United States, and that he could not support me. He refused to help me sign up or register for school. Instead, upon arriving in Massachusetts I worked for a year without attending school because I had to pay my father back for bringing me to the United States.

30. My father and brother, both of whom I lived with in MA, drink very much. When they drank together they would say very hurtful things about me. My father would tell my brother, in front of me, that bringing me to the U.S. was a mistake since they brought me here to work and instead I was wasting my time with school. He would tell my brother they would have been better off leaving me in El Salvador. Hearing my father say these things has really affected me. I would try not to pay attention to them, but it made me feel very alone.

31. My brother was also very violent with me when he drank. I am not sure why but my brother has a lot of anger against me. When he was drunk he would attack me and try to punch or hit me. I would run away from him. On one occasion, he tried to attack me with a knife, yelling and saying hurtful things to me. Rather than protecting me from my brother, my father would drink with my brother, insult me, or call me names. I was so scared of my brother that at times I slept with a knife under my pillow in case he came into my room drunk and angry.

32. Despite being new to this country, and my father having been here for many years, I had to ask around about how to enroll and fortunately found friends who guided me on how to enroll.

<u>Support from My School and Extended Family</u>

33. Despite my life at home being difficult, I have found support I never thought would be possible in my school. Since I have arrived I have attended the same school- Boston International High School in Dorchester, MA. Boston International is a school for English language learners and it provides support for kids like me, who want to learn English and succeed.

16E0049

34. I have worked very hard in school and I am doing well. Despite having to work to help support myself, I attend school full-time and have high hopes of going to college and being a professional. In school my counselors and teachers know my situation and have helped me emotionally and have made sure that I stay in school. They motivate me to stay involved in school. I am part of the school's soccer team where I excel and have made great friends.

35. One of my most important supporters is my counselor Jenny Dunne. Ms. Dunne is a counselor at my school. Approximately two years ago I went to talk to Ms. Dunne because I was feeling alone and having a hard time with my situation at home and what I had gone through in El Salvador. I have been meeting with Ms. Dunne for almost two years now and she is definitely someone I can talk to. She helps me very much and has encouraged me to better my situation so that one day I can become an independent person.

36. On March 3, 2016 I moved to live with my older cousins ▇▇▇▇▇▇▇ in East Boston, MA. Since I arrived in the United States they have supported me and I have a very close relationship with them. In El Salvador, we were neighbors and they always looked after me. When I first arrived in Massachusetts they were the ones that would buy me shoes and clothes when I needed it and would take me out to eat on weekends. Since I have moved in with them they have been very supportive of me and I depend on their support immensely. ▇▇▇▇▇▇▇ encourage me to go school every day and help me with food and other items.

37. In the United States I feel safe and do not live in fear for my life. Here, I do not have to sacrifice my education to support my family. I have learned English and I like that I am exposed to so many new subjects. I am excited to finish high school and go to college, which is something that I never thought would happen in El Salvador.

<u>Conclusion</u>

38. I want to stay in the United States where I am not forced to work in the fields, where my life is not in constant danger, and where I have the support I never had at home and can continue my education. Also, I believe that my life and the lives of my family members would be in danger if I return to El Salvador. If I get legal status in the United States, I can remain in school, graduate from high school, and become the independent adult I have always dreamed of being. For these reasons I would like to stay here in the United States and be safe.

Signed, under the pains and penalties of perjury of the Commonwealth of Massachusetts. This declaration has been read to me in my native language of Spanish, it is true and correct to the best of my knowledge, and I understand its meaning.



03/20/2016
DATE

16E0049

**Certificate of Interpretation**

I, Alan Teran, hereby declare that I am fluent in both Spanish and in English and that I have read the foregoing to the affiant in the Spanish language to the best of my ability.

Signature: _____          Date: 03/20/16

**Notarization**

The declarant appeared before me in Boston, Massachusetts on 3/70/16 with proof of identity, namely his birth certificate, and swore, through the interpreter, that he agreed with all of the foregoing statements.

My commission expires on:

_____
Signature

ANITA P. SHARMA
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
March 16, 2018

EXHIBIT "B"



**KeySteps** INC.
14 Beacon Street
Suite 102A
Boston, MA 02108

16E0049

AFF-

March 14, 2016

To Whom It May Concern:

My name is Jenny Dunne and I am the KeySteps Boston Counselor at Boston International High School and Newcomer's Academy. KeySteps Boston is a non-profit agency that provides counseling, case-management and other support services for at-risk high school students. I have worked with ███████████████ for 2 years, providing ongoing school-based counseling support.

████ self-referred himself for counseling towards the end of his freshman year of high school, in May of 2014. ████ was seeking support around his current living situation and feelings of isolation and stress. During this initial meeting ████ disclosed that he was living without lawful status and that he was residing with his father for the first time in over 10 years. He also explained that his father did not support him attending high school and was nagging him to drop-out of school and work more. It was ████ who enrolled himself in school. At this time he was already working 40+ hours a week while attending school.

Over the past 2 years of working with ████ I have learned a lot about both his life in El Salvador and here in the United States. In El Salvador, ████ was considered the man of the house by age 10, after his older brother left to come join their father in the United States. Their father had made the journey here when ████ was 6. As the man of the house, he was expected to provide for the family, who struggled to simply have enough food to eat. His mother had a heart condition that affected her ability to work. At age 6 ████ was walking the neighborhood selling food his mom had prepared. And by age 10 he was working the fields. With so much familial pressure to work, school was not made a priority, and ████ went long periods of time without attending.

In addition to this stress, ████ was constantly worried about his safety. There was a lot of gang activity in his neighborhood, and all young men were expected to join one of the 2 rival gangs. By age 11 he was being actively recruited and his refusal to engage made him more of a target. At age 16 ████ experienced a traumatic loss when two of his friends were gunned down and killed at the soccer field. ████ is sure that he too would have been with them and killed if his mom had not unexpectedly forced him to do a chore that afternoon. After this incident and other ongoing safety concerns for both himself and his family, ████ made the difficult decision to make the journey to the United States to reunite with his father.

Despite the dangers involved with traveling as an unaccompanied minor, his father did not stop him from making the journey and helped arrange passage for him. His travels were hard and scary, and at times he worried he would not make it. After 22 days of travel with little sustenance, ████ made it to the United States and eventually to Boston to be reunited with his father and brother.

████ was hopeful that his life was going to change for the better once in the United States, but it soon became apparent that his family cared more about the money ████ could make then his well-being. His family did not support him attending school and would complain that he was not generating enough money. Often, at night, when ████ was trying to do his homework, both his father and brother would drink, get loud, call ████ names and even initiate fights. ████ began sleeping with a knife under his pillow in case his brother entered his

FILED

MAR 23 2016    ℕ #9    "Exhibit B"

████olk Probate Court

Boston International High School • Charlestown High School • Newcomers Academy
West Roxbury Academy • Urban Science Academy
(617) 263-1235 • www.keystepsboston.org • FAX (617) 263-1352

16E0049

room while intoxicated and tried to fight him. Despite all the barriers against him, ▇▇▇ continued to come to school, learn English and pass all of his classes.

▇▇▇ has often expressed a desire to leave his father's apartment, but never had the opportunity to do so until recently. His father and brother would quickly spend the little money that ▇▇▇ earned, making it hard for him to save for himself. Despite his difficult situation, ▇▇▇ continued to look for opportunities to leave and when a room in his older cousin's house became available he quickly seized the opportunity to move away from the toxic environment of his father's house. Now, ▇▇▇ feels supported in his efforts to create the future he has hoped for. He feels safe in the United States and able to freely attend school without harassment.

One of the unfortunate realities of my work is that I have seen young people, who feel they have no opportunities or future prospects, make choices that have hurt their futures; choices like dropping out of high school or becoming involved in criminal activity. Despite having a multitude of barriers in his life, ▇▇▇ has never lost hope and made one of these dangerous choices, even though they were presented to him often. Being granted legal status will allow ▇▇▇ to continue on this successful path he has worked so hard to maintain and will allow him to overcome the obstacles created by his parents' mistreatment. He plans to attend college and start working towards a career where he can support himself.

I am invested in this young man's life and future and plan on continuing to support him as he works towards his future goals. I believe that with the support of the school and the family he is now living with and due to his own resilient nature, ▇▇▇ will become a successful contributing member of society. He is exactly the type of hard-working young person that deserves to be protected and helped.

Sincerely,

Jenny Dunne, M.Ed.
KeySteps Boston Counselor
Boston International High School
Newcomer's Academy
100 Maxwell Street
Dorchester, MA 02124
(617)265-7417
Jdunne@keystepsboston.org

EXHIBIT "C"



# DURSO LAW

LAW OFFICE OF CARMEN L. DURSO

**MAIL TO:**
276 Union Avenue, Framingham, MA 01702

Tel: 617-728-9123
Cell: 339-933-0272
Email: carmen@dursolaw.com

*Of Counsel To:*
Heinlein Beeler Mingace & Heineman, P.C.

**BOSTON OFFICE:**
101 Federal Street, Suite 1900
By Appointment Only

March 18, 2024

Bette Bohlke-O'Gara, LICSW,
Executive Director
KeySteps, Inc.
206 Minot Street, # 304
Boston, MA 02122-2039

Jenny G. Dunne, LMHC
9 Allston Street, Apt 2
Charlestown, MA 02129-1901

Re:   James Jones No. 10
Vs.   Jenny G. Dunne, LMHC, and KeySteps, Inc.

Dear Ms. Bohlke-O'Gara and Dunne

Claim is hereby made by James Jones No. 10 ("Jones") against Jenny G. Dunne, LMHC, ("Dunne") and KeySteps, Inc. ("KeySteps"), in accordance with the provisions of Massachusetts G. L. c. 93A, §§2 & 9, and the Regulations promulgated by the Attorney General under G.L. c. 93A, §2(c), in 940 CMR 3.16 (3).

## FACTUAL BACKGROUND

Mr. Jones was a non-English speaking, 16 year old immigrant, from El Salvador, when he came to Boston in 2012 and enrolled in Boston International Newcomers Academy ("BINCA "). He consulted Ms. Dunne in her capacity as a Masters' Level KeySteps Counselor at BINCA. Beginning in 2013, Ms. Dunne used her position to groom Mr. Jones, and then to engage in a sexual relationship with him, which continued until July, 2021.

The American Counseling Association, in 2014, published a Code of Ethics which contained the following provision:

> A.5.a. Sexual and/or Romantic Relationships Prohibited
> Sexual and/or romantic counselor- client interactions or relationships with current clients, their romantic partners, or their family members are prohibited.

"Exhibit C"

Bette Bohlke-O'Gara, LICSW
Jenny G. Dunne, LMHC
March 18, 2024
Page Two


In November, 2017, Ms. Dunne became a Licensed Mental Health Counselor. The American Mental Health Counselors Association, in 2015, published a Code of Ethics which contained the following provision:

> 4. Exploitive Relationships
> CMHCs are aware of the intimacy and responsibilities inherent in the counseling relationship. They maintain respect for the client and avoid actions that seek to meet their personal needs at the expense of the client.
> a.   Romantic or sexual relationships with clients . . . are strictly prohibited.

KeySteps has "thirty-five (35) years of experience working in the City of Boston."  It has consistently represented to the public that its "Licensed Masters' level KeyStep counselors offer full time, year round school-based counseling to help newcomers to the country . . . cope with and resolve issues that hamper their ability to fully participate in academic work. . . .They learn to anticipate and avoid risky behaviors, and make responsible choices that lead to healthy futures."

KeySteps placed Ms. Dunne at BINCA, where she counseled Mr. Jones, starting when he was 17 years old, spoke no English, and lacked an adult's understanding of social and sexual relationships. He was told that one of KeySteps primary functions in the Boston schools was to educate students about sexual behaviors.

Ms. Dunne, in a series of steps, began a sexual relationship with Mr. Jones, which encompassed all aspects of his life.  She had sexual relations with him in her office at BINCA, in her car, and in her home, where she had him spend much of every week with her.  She allowed him to believe they were in romantic relationship, which would last beyond the time he was at BINCA, and they would have a life together afterward.  She talked about them moving together to another state, and starting over.

At one point, Ms Dunne thought she was pregnant with Mr. Jones' child.  He was excited by the prospect; she was very unhappy.  Mr. Jones did not understand, but Ms. Dunne knew, the relationship was purely sexual, and would end when she became tired of him.

Bette Bohlke-O'Gara, LICSW
Jenny G. Dunne, LMHC
March 18, 2024
Page Three


Ms. Dunne knew at the time she commenced the sexual relationship with Mr. Jones that it was prohibited, and she knew during the time while she maintained the relationship that it was improper and harmful to him. She was aware of this because she had been trained to understand the significance of professional boundaries, and the harm which comes from uncontrolled transference and counter transference in a counseling relationship. She also knew about the professional rules prohibiting her behavior, and that she was violating them.

## LEGAL STANDARDS & LIABILITY – DUNNE

### 1.  940 CMR 3.16 (3):

Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2 if:
(3)  It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection;

### 2.  262 CMR 2.05 (2)(a)10:

The Massachusetts Board of Allied Mental Health and Human Services Professions Regulations state a Licensed Mental Health Counselor must have the following qualification In order to become a Licensed Mental Health Counselor:

Knowledge and understanding of the standards set by the code of ethics of the American Counseling Association and the American Mental Health Counselors Association.

## LEGAL STANDARDS & LIABILITY – KEYSTEPS

### 1.  940 CMR  3.05(1) & 6.04(1)

3.05:  General Misrepresentations. (1) No claim or representation shall be made by any means concerning a product which directly, or by implication, . . . has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect.

Bette Bohlke-O'Gara, LICSW
Jenny G. Dunne, LMHC
March 18, 2024
Page Four

6.04:  General Requirements. (1) Misleading Representations.  It is an unfair or deceptive act for a seller to make any material representation of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading, or if the seller does not have sufficient information upon which a reasonable belief in the truth of the material representation could be based.

KeySteps made public representations that its stated purposes was to protect vulnerable students from the consequences of "risky" sexual conduct.  It failed to disclose it was not training its counselors to avoid sexual relationships with the students it was tasked to protect.

Each of the hundreds of sexual contacts between Ms. Dunne and Mr. Jones are separate violations of these regulations, and constitute separate unfair and deceptive acts or practices under G.L. c. 93A.  Mr. Jones has suffered serious personal injuries as a result of these violations.  Personal injuries which result from such unfair and deceptive acts or practices are compensable under G.L. c. 93A, *Maillet v. ATF-Davidson Co.*, 407 Mass. 185, 192 (1990), and may result in the awarding of treble damages.

## INJURIES AND DAMAGES

Mr. Jones has suffered significant damages because of the acts of Ms. Dunne and KeySteps. His life, and his personal relationships with others, have been substantially altered.   He has suffered from depression, shame, nightmares, insomnia, weight loss, flashbacks, and lack of trust.  He has not completed his education and has lost employment opportunities.  His emotional injuries are severe and permanent, and will require mental health treatment for the foreseeable future.

## DEMANDS FOR RELIEF

Therefore, the following relief is demanded by my client:

1.    The payment to James Jones No. 10 of the sum of $ 2,500,000 for the injuries and emotional distress which he has suffered because of these violations.

Bette Bohlke-O'Gara, LICSW
Jenny G. Dunne, LMHC
March 18, 2024
Page Five

2.      The payment of the sum of $250,000 for attorney's fees incurred to date.

3.      The payment of said sums within 30 days of the date of this letter.

## OBLIGATION TO RESPOND

You are further notified that if you fail to respond to this Demand for relief, in writing, within 30 days, you may become liable for up to three times the damages sought herein, as well as the reasonable attorney's fees incurred in the prosecution of this action.

The damages which will be multiplied are the full amounts of any disputed sums, plus any costs and expenses.  Thus, if you fail to make a reasonable offer of settlement within 30 days, and there is a judgment in favor of my client on any of the above Demands, you may be subjected to an additional judgment of up to three times those amounts, plus interest, costs and attorney's fees.

Kindly notify your liability insurer, promptly upon receipt of this letter, that you have received this claim.

Very truly yours,

Carmen L. Durso

CLD/sf
Enc.

\dunne-keysteps-318-24

**By Certified Mail**

EXHIBIT "D"

April 17, 2024

Carmen L. Durso, Esquire
Law Office of Carmen L. Durso
276 Union Avenue
Framingham, MA 01702-6318

Re: ████████████████████
Vs: Jenny G. Dunne, LMHC, and KeySteps, Inc.

Dear Mr. Durso,

I am writing to inform you that I have been denied defense coverage and indemnity by Philadelphia Insurance Companies. I have included a copy of the denial letter for your review and records.

Thank you,

Jenny Dunne

"Exhibit D"